UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH DEMAURO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 98 C 8318 |
| v. | ) | |
| | ) | Judge Gottschall |
| BETTY LOREN-MALTESE; TOWN OF | ) | |
| CICERO; LOUIS GUIDO; MERRICK | ) | |
| SCOTT RAYLE; LEONARD RUTKA; | ) | |
| and TOWN OF CICERO BOARD OF | ) | |
| FIRE, POLICE AND PUBLIC SAFETY | ) | |
| COMMISSIONERS, | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION TO ALTER OR AMEND JUDGMENT**

Plaintiff JOSEPH DEMAURO ("DeMauro"), by his attorneys, submits this Reply
Memorandum in further support of his Motion To Alter or Amend Judgment.

**REINSTATEMENT**

In his Motion, DeMauro established that reinstatement is a presumed, common and integral
component of the remedy for a constitutionally impermissible discharge. Mtn. at 2, citing, *Baird v.
Bd. of Education for Warren Comm. Unit School Dist. No. 205,* 389 F.3d 685, 692 (7th Cir. 2004).
Even the case The Town primarily relies upon to oppose DeMauro's reinstatement recognizes that
"reinstatement is usually the preferred remedy," which should be granted unless the district judge
concludes "after careful consideration in a particular case that the preferred remedy of reinstatement
is not possible or is inappropriate." *McNight v. General Motors Corp.*, 973 F.2d 1366, 1370 (7th Cir.
1992). This is not such a case.

The Town's current Police Superintendent asserts that "DeMauro was terminated for telephoning Deputy Superintendent Leonard Rutka and lying to him." Iniquez Aff. ¶ 5. That assertion flies in the face of the jury verdict on DeMauro's First Amendment claim, which required the jury to find that DeMauro was terminated "because of his political support of Charles Hernandez and his opposition to Betty Loren-Maltese" and that DeMauro would not have been terminated "if he had not politically supported Charles Hernandez." Tr. 1180-83. With all due respect to Supt. Iniquez, who had no involvement in DeMauro's termination, his understanding of why DeMauro was terminated cannot trump a judicial finding after several days of trial and thereby deny DeMauro the preferred remedy of reinstatement. In fact, implicit in the verdict is that if DeMauro had not politically supported Charles Hernandez, he still would be employed by the Cicero Police Department and reinstatement would not be an issue.

Supt. Iniquez also asserts, without even an attempt to provide a foundation, that while previously employed by the Cicero Police Department, DeMauro had a poor "reputation" as a "jokester" and "a sloppy and mediocre officer." Iniquez Aff. ¶ 4. He states that he is "personally familiar with DeMauro" because they were both employed by the Cicero Police Department more than 10 years ago. *Id.* ¶ 2. What Supt. Iniquez fails to mention, however, is that he rarely, if ever, worked with DeMauro, and that *he never supervised DeMauro*. Rather, during the time both were employed by the Cicero Police Department, "then Officer Iniquez worked either as a patrol officer on a different shift from Officer DeMauro or as a detective in a different division of the Department than Officer DeMauro." Affidavit of Charles Hernandez, attached as Exhibit A, at ¶ 9. Thus,

"Officer Iniquez never directly or indirectly supervised Officer DeMauro or had occasion to review Officer DeMauro's work first hand." *Id.*[1]

Charles Hernandez, on the other hand, as a Cicero Police Lieutenant and Shift Commander was "Officer DeMauro's direct supervisor for approximately three years" and thus "was able to observe Officer DeMauro's professionalism and reviewed his work first hand;" his opinion concerning DeMauro's professionalism and competence is both better informed and different than Iniquez's. *Id.* ¶¶ 4-5. Lt. Hernandez found DeMauro "to be a competent and dedicated officer who made positive contributions to the Cicero Police Department." *Id.* ¶ 5. Hernandez never received any complaints about DeMauro's performance of his police duties from Police Department supervisors, rank and file officers, or members of the public. *Id.* ¶ 6. As part of his duties as a supervisor, Lt. Hernandez "reviewed DeMauro's reports and found them to be complete and thorough." *Id.* ¶ 7. Hernandez "would never characterize [DeMauro's] police work as 'sloppy' or consider him to be a 'mediocre' police officer. To the contrary, Officer DeMauro was a serious police officer and his work was exemplary." *Id.* "Officer DeMauro was highly regarded by both his superiors and fellow patrolmen, many of whom continue to work for the Town of Cicero to this day." *Id.* ¶ 8.[2]

---

[1] Leonard Rutka testified that although he was a supervisor, he was unable to evaluate DeMauro's performance of his job duties because, as was the case with Iniquez, DeMauro "never worked on my shift, or he was a patrolman, I was a detective." Tr. 221.

[2] This last assertion by Hernandez is corroborated by trial testimony that then Deputy Supt. Zalas, who was in charge of the entire Cicero Police Department at the time, sought to prevent DeMauro from being discharged, warning him to "be sure you have everything straight ... because ... they're going to come after you." Tr. 815-16. If Deputy Zalas thought DeMauro was a sloppy and mediocre officer, as Iniquez claims, one doubts that Zalas would have cared whether or not the Town was going to come after DeMauro and seek to separate him from the Police Department.

Supt. Iniquez also asserts that Cicero is "unable" to reinstate DeMauro because having "[r]ecently ... hired several new officers to fill existing vacancies ... no open position exists for DeMauro." Iniquez Aff. ¶ 3. In fact, the Town did hire six new police officers on January 9, 2007, 22 days after DeMauro filed his motion for reinstatement, 57 days after judgment was entered on the verdict, and 62 days after the jury returned the verdict. Moreover, DeMauro's intent to seek reinstatement if he prevailed at trial was known to the Town no later than June 2, 2006, when DeMauro tendered his proposed Schedule (g) to the Final Pretrial Order, in which DeMauro stated that if he prevailed at trial, he would seek reinstatement. One easily could infer from this sequence of events that the Town acted "to fill existing vacancies" in the Police Department in order to thwart DeMauro's desire to be made whole via reinstatement.

More importantly, however, the Town's recent hires did not fill all the existing vacancies, and the Town intends to hire more officers in the future. The Town originally sought to hire, and conditionally hired eight police officer applicants, but two of those eight failed certain pre-employment testing. Hernandez Aff. ¶ 10. Thus, *two vacancies currently exist* in the Cicero Police Department. Moreover, "the Town intends to hire seven more police officers in May." *Id*. Indeed, in his Preview of Plans for 2007, attached as Exhibit B, Town President Larry Dominick informed Cicero residents that "[t]he hiring of more police officers" was number one on the list of "things to look for in 2007." Ex. B at 2.

The Town, although not Supt. Iniquez, also raises DeMauro's failure to pass the Firefighter II test and citizen complaints against Officer DeMauro as reasons not to reinstate him. Besides the fact that these matters apparently do not concern Supt. Iniquez, they also are no reason to deny DeMauro reinstatement, "an integral part of the remedy for a constitutionally impermissible

-4-

employment action," such as DeMauro's termination. *Baird*, 389 F.3d at 692. Public Safety Officers Karl Berger and Ronald Graf initially were suspended for failing to pass the Firefighter II exam, but then were reinstated as Patrol Officers because the Town disbanded its public safety officer program. Tr. 234-35, 484-89, 675-80, 691.[3] Thus, DeMauro's lack of Firefighter II certification is not a legitimate reason not to reinstate him to the Cicero Police Department as a Patrol Officer, just as Berger and Graf were reinstated, despite their own lack of Firefighter II certification.

As for citizen complaints, there was evidence at trial of two, not "several" as the Town asserts. The first, documented in Def. Ex. 17, concerned events that took place on July 31, 1995. Tr. 928. It was not until June 4, 1996, almost a year later, but after DeMauro had separated himself from Loren-Maltese's political organization, that reports concerning the incident were compiled and passed on to Police Department supervisors; and it was not until January 27, 1997, when "[t]he election was right around the corner," that then Deputy Supt. Zalas, who told DeMauro to watch out because "they're coming after you," forwarded the file to the Board for "further investigation." Tr. 929-30. The second, documented in Def. Ex. 18, also was forwarded to the Board for "further investigation" on January 27, 1997. Tr. 930. The file includes a investigative report by Leonard Rutka, who concluded that the complainant's allegations were contradicted by another citizen witness, and that the complainant had financial motives for filing his complaint. Tr. 932. DeMauro never was disciplined for either incident, neither incident was mentioned in the dismissal charges against DeMauro or in the hearing on those charges, and there is no evidence that either incident

---

[3] Berger later was promoted to Sergeant and then appointed Shift Commander and Commander of the special operations unit. Tr. 473, 481, 489-90.

played any role in DeMauro's discharge. Tr. 932-33. If the Town did not consider these complaints a reason to discharge DeMauro, they certainly cannot constitute a legitimate basis to deny him reinstatement.

Although Supt. Iniquez asserts in a grossly conclusory manner that DeMauro would not have "a positive working relationship" and that his return to the Cicero Police Department "would create great controversy," he offers neither evidence nor explanation to support those conclusions, and no such evidence was offered at trial. On the contrary, DeMauro served almost three and one-half years in the Police Department without any major controversy, and he never was suspended until the Town initiated its politically motivated and unconstitutional discharge proceedings. Commander Berger testified that he considers DeMauro "a friend of mine." Tr. 483. And Charles Hernandez, who was DeMauro's direct supervisor for three years, states under oath that "Officer DeMauro was highly regarded by both his superiors and his fellow patrol officers, many of whom continue to work for the Town of Cicero to this day." Hernandez Aff. ¶¶ 5-8.

Finally, the cases upon which the Town relies do not support its position that DeMauro should not be reinstated. In *Tennes v. Commonwealth of Massachusetts Dept. of Revenue*, 944 F.2d 372 (7th Cir. 1991), the court affirmed the denial of reinstatement, finding that it was not unreasonable for the district court to conclude that "after all that had transpired" (which was not further described), the ADEA plaintiff would not have enjoyed "the confidence or respect of current management," and that his future with that employer "would most likely have been short lived even absent the discrimination given the high turnover rate for [the defendant's] employees and the fact that [the plaintiff] did have a weak employment history in general and with [the defendant] in particular." *Id*. at 381. None of that is true in this case. In *McKnight v. General Motors Corp.*, 973

F.2d 1366 (7th Cir. 1992), cert denied 507 U.S. 913 (1993), the court affirmed the denial of reinstatement of a plaintiff who sought "a completely different job" in a city other than where he had been employed, and where there was no basis to conclude that the plaintiff was qualified to perform the job he requested or that such a position was available. *Id.*, 973 F.2d at 1370-71. That is a far cry from this case. And in *Coston v. Plitt Theatres, Inc.*, 831 F.2d 1321 (7th Cir. 1987), cert. denied 485 U.S. 1007 (1988), vacated on other grounds, 486 U.S. 1020 (1988), the court affirmed the denial of reinstatement of the plaintiff because the position he sought required that he "hold himself out as a managerial representative of the employer" and because the position that plaintiff held had not been filled by any other employee after a reduction-in-force. *Id.* at 1331-32. The Patrol Officer position that DeMauro seeks is or soon will be available and it is far from the type of "high level, unique, or unusually sensitive positions" to which reinstatement often is not appropriate. *Id.* at 1331.

The Seventh Circuit recognizes that employment in some careers "is more than a way to make money, it is a profession with significant non-monetary rewards," so that money damages alone, without reinstatement, may be a "hollow victory." *Baird*, 389 F.3d at 692 (citations omitted). For DeMauro, being a police officer was such a career. Tr. 786-87, 852. The Town cites no case where reinstatement to a police officer position was denied, much less for weak reasons of the sort now advanced by the Town. Nothing in the record suggests any legitimate reason for finding that reinstating DeMauro would be impossible or inappropriate. Any employer who loses a discrimination case cay say, "We don't want the prevailing plaintiff back." That is not enough to deny that plaintiff the preferred remedy of reinstatement. DeMauro is entitled to that remedy. The Court should order the Town to reinstate DeMauro.

# PREJUDGMENT INTEREST

In his Motion, DeMauro established that prejudgment interest is an element of complete compensation, without which a plaintiff is not made whole. Mtn. at 4-5 (citations omitted). Defendants argue that the Court should deny DeMauro this element of complete compensation, asserting that because the jury returned a general verdict, the amounts awarded for lost wages, Board expenses and emotional suffering are not readily determinable. Stripped to its essence, Defendants argument comes down to this: in any case where the plaintiff seeks damages for discrete injuries, his consent to a general verdict form forfeits his entitlement to complete compensation in the form of prejudgment interest. That is not the law, however, and none of the cases cited by Defendants suggests that it is. Rather, it is only "where the district judge determines that it [is] too hard to figure out what the jury awarded [for each item of damages], that a civil rights plaintiff may not be entitled to prejudgment interest." *Daniels v. Pipefitters Ass'n Local Union No. 597*, 945 F.2d 906, 925 (7th Cir. 1987). "The question is ... whether the computation is impossible or hopelessly speculative." *Williamson*, 817 F.2d at 1298. In this case, the answer to that question is "no."

Here, DeMauro's lost wages were calculated by comparing what he would have been paid by the Cicero Police Department had he not been terminated, amounts set forth in the collective bargaining wage schedules that were in evidence, against the amounts DeMauro was paid in other jobs, as established by his income tax records, which also were in evidence. Tr. 847-50. All told, his lost wages amounted to $157,735.54. That figure was undisputed; Defendants neither challenged it nor proposed a different figure. Thus, it is far from impossible or hopelessly speculative to determine what amount the jury awarded for lost wages, the only amount for which there was any evidence and as to which there was no dispute. The same is true with respect to the fees and other

expenses DeMauro incurred in connection with the Board proceedings, which were documented in Pltf. Ex. 51 and amounted to $9,453.17, again an amount that was not in dispute and the only sum for which there was any evidence whatsoever. There simply is no reason to believe that the jury disregarded the Court's instruction that its "first duty [was] to decide the fact from the evidence in the case. Tr. 1174.

The fact that the jury then decided to award damages for emotional injury in an amount that yielded a total verdict of $250,000 does not make computing the amount awarded for emotional injuries impossible or hopelessly speculative. Subtracting the undisputed amounts of lost wages and Board expenses from the $250,000 verdict yields the easily ascertainable sum of $82,111.29. The fact that the jury chose that amount to reach an even $250,000 is no more illogical than it would have been to award an even $82,000 for emotional injuries, for a total verdict of $249,188.71. The fact remains that the amount awarded for each element of damages is easily ascertainable despite the use of the general verdict form. DeMauro therefore is entitled to prejudgment interest on each of those sums. Since Defendants do not dispute the methodology or interest rates DeMauro used to calculate prejudgment interest amounts, prejudgment interest should be awarded in the amounts sought by DeMauro.

Defendants also argue that DeMauro cannot recover prejudgment interest on damages awarded for mental and emotional pain and suffering. Once again, however, defendants are wrong. "Prejudgment interest should apply to all past injuries, including past emotional injuries.[4] ... Refusing to award prejudgment interest ignores the time value of money and fails to make the

---

[4] DeMauro testified that the manifestations of his emotional pain and suffering when he obtain full-time employment as an Illinois Department of Corrections Parole Officer in 2000. Tr. 779, 853. He did not request damages for future emotional suffering.

plaintiff whole." *Thomas v. Texas Dept. of Criminal Justice*, 297 F.3d 361, 372 (5th Cir. 2002). Although DeMauro relied upon *Thomas* in his motion, Defendants simply ignore it, yet they cite no case from the Seventh Circuit or elsewhere that *holds* to the contrary. *Thomas* also supports DeMauro's claim of prejudgment interest on his emotional injuries being calculated from the date of his suspension. *Id*. Defendants do not argue that that was inappropriate. Thus, prejudgment interest should be awarded on this damages item in the amount sought by DeMauro.

WHEREFORE, for all the reasons stated herein and in his Motion to Alter or Amend Judgment, DeMauro prays the Court grant that motion and provide DeMauro all the relief he seeks therein.

Respectfully submitted,

/s/     Terence J. Moran
        One of Plaintiff's attorneys

Terence J. Moran, Esq.
Peter C. McLeod, Esq.
Hughes Socol Piers Resnick & Dym, Ltd.
70 W. Madison Street, Suite 4000
Chicago, Illinois 60602
312/580-0100
312/580-1994 fax

S:\WD\LIT\1387\10534\Reply Memo - P's Mot to Alter Judgment.wpd